UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 07-CR-1609-L |
| Plaintiff, | ) | |
| | ) | **MODIFIED ORDER** |
| v. | ) | |
| | ) | |
| KELLIE SHAVER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

    Following extensive briefing and oral argument, the Court took under submission several issues raised by Defendant Kellie Shaver ("Defendant" or "Ms. Shaver") in her Motion for a Judgment of Acquittal or, alternatively, Motion for a New Trial. The Court, having fully considered the submissions and argument of the parties, as well as the applicable authorities, concludes that a new trial is indeed warranted. Accordingly, Defendant's Motion for a New Trial is **GRANTED.**

    The Court harbors serious concerns regarding the overall fairness of Ms. Shaver's trial due to the introduction of prejudicial evidence, namely the alleged "bricks/blocks" evidence that was referenced in recorded "jailhouse" telephone calls made subsequent to Defendant's arrest. The Court's concerns first arose when it learned that the Government failed to disclose to the Court material testimony that the "bricks/blocks" were potentially marijuana, not methamphetamine. A series of actions later taken by the Government now leads to the conclusion that admission of the testimony that the "bricks/blocks" evidence as methamphetamine was in error.

## I. BACKGROUND

On June 8, 2007, Ms. Shaver drove a vehicle to the San Ysidro Port of Entry. Defendant was accompanied by her friend, Michael Mallory.[1] In pre-primary, a narcotic detector dog was alerted to the passenger side rear door of the vehicle. While still in pre-primary, Customs and Border Protection Officer J. Hicks asked Ms. Shaver and Mr. Mallory if they had "anything" to declare. Both individuals gave negative customs declarations. Ms. Shaver explained that she and Mr. Mallory were returning to Defendant's home in El Cajon, California. Officer Hicks questioned Ms. Shaver about the ownership of the vehicle, and he was told by Mr. Mallory that they were driving the vehicle for a friend (who was later determined to be Gabriel Medrano Gonzalez, aka Carlos Medrano Gonzalez, aka "Cholo").

Officer Hicks inspected the car and found some packages within the rear seat. Defendant was instructed to proceed to secondary inspection. Once there, inspection of the car revealed additional packages. A total of four packages, with a gross weight of 5.5 kilograms, were found on that date. A presumptive test of one of the packages revealed a positive reaction to the presence of methamphetamine. The packages were wrapped in tupperware, tape, and cellophane wrapping. On July 31, 2007, an additional package of methamphetamine, weighing approximately 1.25 kilograms, was later found concealed within the vehicle.

On June 20, 2007, a federal grand jury returned a two-count Indictment charging both Defendant and Michael Mallory with: 1) Importation of Methamphetamine in violation of 21 U.S.C. §§ 952 and 960;  and 2) Possession of Methamphetamine with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1). Defendant was arraigned on the Indictment on June 21, 2007, and pleaded not guilty.

. . .

. . .

. . .

. . .

---

[1] Michael Mallory was originally charged as a co-defendant in this case, but his charges were later dismissed on October 18, 2007.

### A.  Pre-Trial Events

After her arrest, Ms. Shaver made several phone calls while still in custody. The "jailhouse" phone calls pertinent to the Court's discussion consisted of a series of recorded phone calls between: (1) Ms. Shaver and her friend Lisa Garibay ("Ms. Garibay"); and (2) Ms. Shaver and her then boyfriend Gabriel Medrano Gonzalez, aka Carlos Medrano Gonzalez, aka "Cholo" ("Cholo").[2] The relevant telephone calls took place between June 18-19, 2007. During these telephone calls, Ms. Shaver discussed with both Cholo and Ms. Garibay two "bricks" or "blocks" that were apparently found by Cholo in the attic of Ms. Shaver's then residence. The "bricks/blocks" were purportedly narcotics of some kind. In a motion *in limine*, the defense moved to exclude the introduction of all of the jailhouse telephone calls as irrelevant. (Doc. 59 at 3-4, Doc. 87 at 10-12).

The Government sought to introduce the telephone calls as "other act" evidence under Rule 404(b) of the Federal Rules of Evidence ("Rule 404(b)"). (Doc. 54 at 4, Doc. 109 at 1-3). The Government argued that Ms. Shaver "supervised and brokered another methamphetamine distribution" from jail and "requested both the proceeds of [the] sale and . . . a portion of the methamphetamine be saved so that she could use it when she was released on bond." (Doc. 54 at 4). Ms. Shaver, however, never discussed the actual type of drugs involved in the jailhouse telephone calls when discussing the "bricks/blocks."

The Government proffered that both the terms "bricks" and "blocks" are specific narcotic slang terms. (Doc. 90 at 4-5). The Government sought to introduce the testimony of Immigration and Customs Enforcement Special Agent Carol Bracamonte to testify that, in her opinion, Defendant was "discussing another car load when she [was] discussing the roof." (Doc. 65 at 5). Agent Bracamonte would also explain that Ms. Shaver was talking about "distributable amounts of narcotics when she discusses 'two bricks.'" *Id*. Agent Bracamonte would further testify that the narcotics discussed within the jailhouse telephone calls were likely methamphetamine based on their description during the telephone calls. *Id.*

. . .

---

[2] There was also a series of recorded phone calls that occurred between Ms. Shaver and her mother on June 9, 2007; June 15, 2007; and June 19, 2007. However, these calls are less relevant to the Court's present discussion, and as a result will not be addressed in this Order.

On November 26, 2007, the Government stated that their expert, Agent Bracamonte, was unavailable for trial. (Doc. 110 at 5). On December 7, 2007, the Government designated Immigration and Customs Enforcement Special Agent Chris Lindung ("Agent Lindung") as their replacement expert. (Doc. 111 at 2). Agent Lindung's expected testimony was consistent with the previously proffered testimony of Agent Bracamonte, and no change in the substance of that testimony was expected. The Government also intended to present expert testimony as to the terms in the jailhouse telephone calls referring to narcotics smuggling, precisely discussing the terms "blocks," "bricks," "tubs," and "stuffing loads." (Doc. 111 at 2).

Throughout the pendency of this case, the Government maintained that the "bricks" and "blocks" were inextricably intertwined with the present offense, as an ongoing methamphetamine transaction. (Doc. 109 at 2; Doc. 111 at 2). The Government contended the jailhouse telephone calls "corroborat[ed] the fact that [Ms.] Shaver was involved in drug trafficking and/or drug smuggling activities.[3] (Doc. 122 at 5). The Government argued that Defendant's "statements that she 'looked' for the blocks, that she underst[ood] which 'blocks' and 'bricks' [were] being discussed, that she indicate[d] it is 'good for me' that the blocks of narcotics were found, and that she clearly asked and understood that Cholo was making money from these blocks and bricks" translated that the "bricks/blocks" were methamphetamine. (Doc. 122 at 5). The Government also maintained that the substance of the telephone calls made "it clear that a 'tub' was found, which [was] exactly what was found in [Ms.] Shaver's car on the day of her arrest." (Doc. 109 at 3).

The Court was persuaded by these arguments, and accepted as true the Government's assertion that the "bricks/blocks" were methamphetamine. Accordingly, Defendant's motion *in limine* to exclude the jailhouse telephone phone calls was granted in part and denied in part. The Court admitted redacted portions of the June 18-19, 2007, jailhouse telephone calls (under the guise that the "bricks/blocks" were methamphetamine) as part in parcel of the same transaction or occurrence as well as pursuant to Rule 404(b). Based on the Government's proffer, the Court also allowed Agent Lindung's (the Government's expert) proposed testimony at trial.

---

[3] The Government also argued in the alternative that the telephone calls were admissible under Fed. R. Evid. 404(b) as evidence to show knowledge, absence of mistake and *modus operandi*. (Doc. 111 at 2).

**B.      Defendant's Trial**

The Government also filed a motion *in limine* invoking Rule 615 of the Federal Rules of Evidence, and requested that Immigration and Customs Enforcement Special Agent Robert Kearney ("Agent Kearney") remain present during trial as the Government's designated officer (or case agent). (Doc. 38-2 at 20). The Court granted the Government's request, and allowed Agent Kearney to remain present for the entire trial.

Defendant's jury trial began on December 11, 2007. The Government's non-expert witnesses testified consistent with the factual details above. The Government's expert, Agent Lindung explained that the various terms used in the jailhouse telephone calls, including "blocks", "bricks", "tubs", and stuffing loads had specific meaning to narcotics smuggling. Agent Lindung opined that based on his knowledge and experience, the description of the "bricks/blocks" related to methamphetamine.

Upon completion of the Government's case, Defendant presented a defense. Over the Government's objection, the Court allowed defense witness Michael Garber to testify regarding a declaration against interest made by Cholo, an un-indicted co-conspirator in this case. It was during Mr. Garber's testimony that the series of events took place, which led to the Court's concerns, not only with Rule 404(b) evidence, but particularly over actions taken on the part the AUSA.

On December 12, 2007, during the evening of the third day of trial and prior to the defense resting their case, the Government served a subpoena on Ms. Garibay at approximately 6:05 p.m. (Doc. 132-2 at 3). The agent serving the subpoena was the testifying case agent, Agent Kearney, who was present for the entire trial. Apparently, the decision to serve Ms. Garibay was made by the AUSA during trial based upon a comment that was made by defense counsel. The comment was made in response to an objection by the Government, which allegedly inferred that Ms. Garibay may have set up Ms. Shaver. (Doc. 132-2 at 3). The AUSA then directed Agent Kearney to inform Ms. Garibay that she was being accused of "setting up" Ms. Shaver. (Doc. 132-2 at 3).

The Court notes that no evidence was presented supporting this inference. Rather it arose in the context of a statement made by defense counsel during Mr. Garber's examination, which was misconstrued (albeit honestly believed) by the Government. The AUSA, acting in a sense of

1  urgency, ordered the case agent to serve a subpoena immediately on Ms. Garibay (an already
2  subpoenaed defense witness) after trial had concluded for the day. (Doc. 132-2 at 3). Ms. Garibay
3  was subpoenaed to testify for the very next day, December 13, 2007, at 9:00 a.m.

4  Defense counsel was informed by her investigator later that evening that Ms. Garibay
5  urgently wished to speak to her, and that Ms. Garibay was extremely agitated and upset. (Doc. 133
6  at 3). Ms. Garibay wanted to know why she was being accused of "setting up" Defendant. (Doc.
7  133 at 3). According to defense counsel, the Government's actions had compromised the defense
8  witness. Ms. Garibay was told by Agent Kearney (while serving the subpoena and again during a
9  later telephone call at approximately 9:00 p.m.) "that there had been changes, and the defense team
10 is now -- was now saying that [Ms. Garibay] helped set Ms. Shaver up. [Ms. Garibay] was part of
11 the setting up." (Doc. 132-2 at 10).

12 This message, was communicated to the defense witness expressly at the direction of the
13 AUSA. Agent Kearney explained in a subsequent declaration that he was instructed by the AUSA
14 to explain to Ms. Garibay that the reason she was being called as a witness was "because the defense
15 team in [Ms.] Shaver's case had implied that she [(Ms. Garibay)] had assisted in setting up [Ms.]
16 Shaver." (Doc. 132-2 at 4). Agent Kearney explained that Ms. Garibay's childcare costs and "other
17 relevant expenses accrued as a result of complying with the subpoena" would also be reimbursed.
18 (Doc. 132-2 at 4.) Pursuant to the AUSA's instruction, Agent Kearney was also instructed to "offer
19 to drive Ms. Garibay to court if she was unable to get to court herself." (Doc. 132-2 at 3). Agent
20 Kearney notified the AUSA that Ms. Garibay "appeared nervous about receiving the subpoena."
21 (Doc. 132-2 at 4).

22 Several hours later, the AUSA requested that Agent Kearney re-contact Ms. Garibay to
23 request that she now arrive at his office one hour prior to her subpoenaed court appearance. (Doc.
24 132-2 at 5). Agent Kearney contacted Ms. Garibay at **8:53 p.m.** to relay this information.
25 Sometime after this telephone call is when Ms. Garibay contacted defense counsel in an uproar. As
26 a result, defense counsel sent an e-mail to the AUSA informing him of Ms. Garibay's accusations
27 and expressed concern over the false information communicated to the witness. (Doc. 133 at 4).
28

. . .

As directed by the Government's subpoena, Ms. Garibay showed up at Court the next day. Defense counsel objected to Agent Kearney misinforming Ms. Garibay that the defense team had taken the position that she had participated in setting up Ms. Shaver. Defense counsel raised this issue with the Court and "sought a remedy by way of a mistrial for prosecutorial misconduct relating to the manner in which Ms. Garibay was served by a government agent at the direction of the assigned prosecutor." (Doc. 133 at 4).

The defense further contended that the AUSA was continuing to engage in improper communications with Ms. Garibay in a vein effort to influence the witness. (Doc. 133 at 4). The AUSA went into the hallway with Ms. Garibay when she first arrived, and was overheard by another Federal Defender (David Peterson, Esq.) telling Ms. Garibay that she had to come back into court and answer questions because "the defense says we lied to you."[4] (Doc. 133 at 3; Doc. 133-2 at 5).

The defense argued that the Government's actions violated the Sixth Amendment and Rule 615 of the Federal Rules of Evidence by interfering with a defense witness. Specifically, Defendant objects to the Government's attempts to improperly influence Ms. Garibay's testimony by discussing trial events with her prior to her testifying, and ultimately misleading her in the process.

After defense counsel's strenuous objections to the Government's tactics, the Court too became concerned with a violation of Rule 17 of the Federal Rules of Criminal Procedure in that the Government sent an agent, who was a party, percipient witness, and present during the entire trial to subpoena a potential adverse witness when the agent had a vested and obvious interest in the outcome. The directions to Agent Kearney by the AUSA put him in an untenable situation, not one of his own choosing.

As a result, the Court held a hearing with Ms. Garibay regarding her state of mind and her ability to testify if called as a witness. Although obviously disturbed by the circumstances, Ms. Garibay testified at the hearing that she felt comfortable to testify if called. (Doc. 132-2 at 10). The

---

[4] The Court is concerned that the parties failed to timely notify the Court regarding the AUSA's exact comments in the hallway. It was not until much later that the Court became fully aware of the AUSA's actions.

Court assured Ms. Garibay that there was no testimony that she was "trying to set up anybody" and that such a statement or characterization was incorrect. (Doc. 132-2 at 10).

The Court then learned of the Government's intentions to speak with Ms. Garibay privately. The Court concluded that an interview of Ms. Garibay by the Government under such circumstances might create additional issues. Therefore, the Court directed both parties to speak to Ms. Garibay together since she was subpoenaed by both sides. During that joint meeting with the AUSA, Ms. Garibay, defense counsel, and the parties' respective investigators, Ms. Garibay proceeded to respond to the attorneys' questions. Additionally, at that time, Ms. Garibay told the AUSA that the "bricks/blocks" discussed within the telephone calls between Defendant and herself were in fact marijuana, not methamphetamine. (Doc. 133 at 4; Doc. 133-2 at 9). Ms. Garibay further explained that the drugs belonged to Cholo, not the Defendant. (Doc. 133 at 4; Doc. 133-2 at 9).

Despite its obvious relevance, the AUSA failed to inform the Court of this new information. Equally important, when the AUSA learned of this critical information, he took no steps or further inquiry in determining how Ms. Garibay was aware of that information, nor did he attempt to either verify or determine reasons to reject the information. A Duty of Candor is expected and required by the Court. Neither the Government, nor the defense, informed the Court as to Ms. Garibay's comments, nor did either party call Ms. Garibay as a witness.[5] The AUSA later told the Court that he did not "put [Ms. Garibay] on the stand because [he thought] she [was] lying." (Doc. 146-2 at 10). Notwithstanding the information provided by the Government's own witness, the AUSA in his closing argument, argued that the "bricks" and "blocks" were methamphetamine. (Doc. 146-2 at 7-8). Defense counsel's objection to this argument was overruled by the Court. On December 14, 2007, the jury returned a verdict of guilty as to both counts.

. . .

. . .

. . .

---

[5] In a post-trial motion the defense expressed their reasons for not calling Ms. Garibay in that "it was impossible for anyone to ascertain the level of hesitation, anxiety or distrust that [Ms. Garibay] harbored towards the defense after what she had been told by the prosecutor and the federal agent. Even though Ms. Garibay had relevant, significant exculpatory information, at that time . . . the defense believed Ms. Garibay was too nervous and uneasy to call as their witness because she would appear untruthful in the eyes of the jury."

. . .

. . .

## II. ANALYSIS

The Court's primary concern is whether Ms. Shaver received a fair and impartial trial. "A fair trial in a fair tribunal is a basic requirement of due process." *United States v. Marks*, ___ F.3d. ____*3 (9th Cir. 2008 WL 2389528). It is the Court's highest duty to ensure that each defendant receives an impartial trial, which fully comports with the Constitution. Simply put, it is the Court's ultimate bottom line. In order to receive a new trial based on prosecutorial misconduct, a defendant must demonstrate that the prosecutor engaged in improper conduct and that "it is more probable than not that the prosecutor's conduct materially affected the fairness of the trial." *United States v. McKoy*, 771 F.2d 1207, 1212 (9th Cir.1985); *see also United States v. Aichele*, 941 F.2d 761, 765 (9th Cir.1991); *United States v. Smith*, 893 F.2d 1573, 1583 (9th Cir.1990); *United States v. Polizzi*, 801 F.2d 1543, 1558 (9th Cir. 1986). The prosecutor's conduct must be viewed in the context of the entire trial. *McKoy*, 771 F.2d at 1212. Defendant argues that prosecutorial misconduct occurred when the Government deliberately violated Defendant's Fifth and Sixth Amendment rights to present a defense absent government interference (*vis-a-vis* the defense witnesses). (Doc. 133 at 5). Defendant also argues that a violation of Rule 615 of the Federal Rules of Evidence ("Rule 615") occurred by providing (false) information to a perspective witness in an effort to bias that witness. (Doc. 133 at 5). Additionally, the defense seeks a mistrial or dismissal based on Defendant's objection to the alleged false inferences that the "bricks/blocks" were methamphetamine as argued by the AUSA in final argument, which related to Rule 404(b) evidence.

As a preliminary matter, the Court states that any prosecutorial error that may (or may not) have occurred is limited solely to the AUSA. In order to evaluate the circumstances of this case it is necessary to evaluate the facts to determine whether there was error and if so did such error result in prejudice to Ms. Shaver. The Court has a number of specific concerns relating to this inquiry.

A. Violation of Rule 615 of the Federal Rules of Evidence and/or Rule 17 of the Federal Rules of Criminal Procedure

The Government's subpoena of Ms. Garibay was obviously for rebuttal testimony due to a

perceived belief that defense counsel's comments (in response to an objection) revealed a defense theory that Ms. Garibay "set up" Ms. Shaver. Despite this perceived belief, there was simply no testimony or evidence to this affect. The Government's perception was plainly erroneous given that the defense theory was always that Cholo set up the Defendant.

Rule 615 provides, in relevant part, that, "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses." Fed.R.Evid. 615. This process serves both to reduce the danger that a witness' testimony will be influenced by hearing the testimony of other witnesses, and to increase the likelihood that the witness' testimony will be based on his/her own recollections. *See e.g., United States v. Hobbs*, 31 F.3d 918, 921 (9th Cir. 1994). Rule 615 contains certain specific exceptions to the general rule of exclusion of witnesses, including when a witness is an "essential party" under Rule 615(3). *United States v. Seschillie*, 310 F.3d 1208, 1213 (9th Cir. 2002) (expert witness may qualify as an "essential witness" for purposes of Rule 615, such as when the expert's presence is required to advise counsel), *cert.* denied, 538 U.S. 953 (2003). Rule 615 "authorizes an officer designated by the Government 'as its representative,' to remain in the courtroom during the testimony of other witnesses." *United States v. Brewer*, 947 F.2d 404, 408 (9th Cir. 1991); *United States v. Thomas*, 835 F.2d 219, 223 (9th Cir. 1987) (Rule 615 does not require exclusion of testifying government agent from trial during testimony of other witnesses because agent is an officer for the Government).

"It is not at all uncommon for trial attorneys to treat sequestration orders under Rule 615 in a nonchalant manner, but a cavalier approach is not advisable." *United States v. Williams*, 136 F.3d 1166, 1169 (7th Cir. 1998). A circumvention of Rule 615 occurs when witnesses indirectly defeat its purpose by *either* discussing testimony they have given *or* events in the courtroom with other witnesses who are to testify. *United States v. Greschner*, 802 F.2d 373, 376 (10th Cir. 1986) (Rule 615 prohibits witnesses from discussing the case with other witnesses). Rule 615 applies equally to rebuttal witnesses and to witnesses who have already testified. *See United States v. Ell*, 718 F.2d 291, 293 (9th Cir. 1983). Altogether, it is a general understanding that when Rule 615 is invoked at the beginning of the trial, as it was in this case, trial information is *not* to be revealed by witnesses to other witnesses, whether that witness is a case agent or not.

The Government, in its defense of the directive to the case agent, makes several bald assertions and relies on legal authority which is clearly inapposite to this case. Also, dubiously absent from the Government's numerous Points and Authorities is authoritative Ninth Circuit law validating the AUSA's directive. Rather, the Government provides a superficial gloss in its justification of the propriety of Agent Kearney's interaction with Ms. Garibay, but in the process fails to address the actual issues in this case.

The Court cannot look at Rule 615 in isolation. In this case, Rule 615 must also be considered in conjunction with Rule 17 of the Federal Rules of Criminal Procedure ("Rule 17") which states in pertinent part: "A marshal, a deputy marshal, or any *nonparty* who is at least 18 years old may serve a subpoena." Fed.R.Crim.P. 17(d) (*emphasis added*). Under Rule 17, the Court considers both Agent Kearney and the AUSA to be parties in this case. Agent Kearney was the agent in charge of this prosecution. As the assigned case agent, he sat with the AUSA throughout the entire trial and testified to crucial aspects of the case. Clearly, Agent Kearney had a vested and obvious interest in the outcome of the matter.

Rule 17 specifically excludes parties as persons permissible to subpoena witnesses. It is important to ensure that there is no presence of improper communications with prospective witnesses. The Court is aware it is a fairly common occurrence for agents to serve subpoenas. In 99% of the cases no prejudice attaches to the procedure, and in fact it is an efficient and cost effective process. However, in cases where the witness is in similar circumstances as found in this case, it is clearly unwise to do so. It was unwise to use a party to subpoena an adverse witness and further injudicious to direct a party to reveal information learned in court to the witness, especially information that would be sure to upset her. No one wants to be told they are being accused of setting someone up, the consequences were utterly predictable. This, of course, does not preclude a witness meeting by agents or assistants to review testimony prior to testifying. However, such a meeting did not take place here until after the witness was already compromised.

Notwithstanding the above concerns by the Court, the actions taken by the Government must be prejudicial to the outcome of the case if a mistrial is to be declared. *See McKoy*, 771 F.2d at 1212. Ms. Garibay testified concerning these events and stated that although she was nervous, she

did not feel presently intimidated, and was comfortable to testify without fear of harm if called. (Doc. 132-2 at 10-11).

Therefore, in light of Ms. Garibay's testimony that she could and would testify, the Court declines to rule on whether the violations of Rule 615 and Rule 17 amounted to a Sixth Amendment violation that requires a mistrial. In contrast, however, the Court believes the information provided by Ms. Garibay relating to the "bricks/blocks" evidence does compel a mistrial.

B. The "Bricks/Blocks" Evidence

The Government sought introduction of a series of jailhouse telephone calls occurring between June 18-19, 2007, on the premise that Ms. Shaver allegedly "supervised and brokered another methamphetamine distribution." (Doc. 54 at 4). The Government claimed that Ms. Shaver "requested both the proceeds of [the] sale and also that a portion of the methamphetamine be saved so that she could use it when she was released on bond." (Doc. 54 at 4). The Government argued that the jailhouse telephone calls should be admitted because: (1) they occurred after Ms. Shaver's arrest; (2) the circumstances were similar since Ms. Shaver "described [two] bricks being removed from the roof of a vehicle[6] and then being sold;" and (3) the "deal [was] expressly coordinated with "Cholo," the same purported bad guy in the instant case." (Doc. 54 at 5-6). The Government further argued that the telephone calls were direct evidence that Ms. Shaver was involved in distributing methamphetamine. (Doc. 54 at 5-6).

There was no distinction at any point during the trial regarding the chemical makeup of the bricks. The Government successfully argued that the "bricks/blocks" were methamphetamine (similar and related to the drugs found inside the vehicle driven by the Defendant in the present offense). The Government convinced the Court that both endeavors were essentially the same transaction as an ongoing occurrence. Accordingly, the Court allowed the "bricks/blocks" evidence under the belief that the "bricks/blocks" were methamphetamine as the Government proffered.

When the Government argues a set of inferences to the Court that results in an evidentiary ruling based on those inferences (in this case the Rule 404(b) evidence) and then a Government witness later calls into question those inferences, the Court needs to hold a hearing outside of the

---

[6] Later evidence indicated that the bricks were found in the "attic" of Defendant's home, and not in the "roof" of a vehicle. (Doc. 109 at 1).

presence of the jury to determine if the original ruling was correct. Ms. Garibay told the AUSA that the "bricks/blocks" discussed within the telephone calls between Defendant and herself were in fact marijuana, not methamphetamine. (Doc. 133 at 4; Doc. 133-2 at 9). Ms. Garibay further explained that the drugs belonged to Cholo, not the Defendant. (Doc. 133 at 4; Doc. 133-2 at 9).

The Government maintains that it "did not feel that anything Ms. Garibay said on this issue had a sufficient indicia of reliability." (Doc. 142 at 6). However, the declarations provided by the parties regarding the joint meeting show that no effort was made to determine how she knew the information she gave, nor was there any attempt to test her credibility as to that information.

Had the Court been given the opportunity to weigh the new information provided by Ms. Garibay, the Court would have made a finding of fact regarding the reliability of her statements. The Court would have held a hearing to determine if the Court's ruling allowing the admission of the "bricks/blocks" evidence as methamphetamine under Rule 404(b) was correct. It was an essential fact that needed to be resolved, and depending on the outcome it may have modified the Court's prior ruling as to the admissibility of the "bricks/blocks" evidence.

Under Rule 404(b), evidence of a person's other crimes, wrongs, or acts may not be admitted if the sole intention is to prove that the person's conduct during the present offense is in conformity with his or her conduct on a different occasion. But "other act" evidence is admissible for other purposes, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake. Fed.R.Evid. 404(b). A four-part test guides whether evidence should be admitted under Rule 404(b). Evidence of "other act" conduct may be admitted if: "(1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged." *United States v. Vo*, 413 F.3d 1010, 1018 (9th Cir. 2005) (internal citations and quotations omitted).

In this case, the admission of the "bricks/blocks" evidence might have failed on the strength of the first prong alone as this evidence (viewed as marijuana) bore little discernable relationship to any material point at issue in this case. The Court uses this uncertain language because it was never given the opportunity to properly evaluate the true nature of the "bricks/blocks" evidence in light of Ms. Garibay's statements, and must now speculate to some degree as to what evaluation

might have occurred. The introduction of the "bricks/blocks" evidence, if determined not to be methamphetamine, would also appear to be propensity evidence, which is prohibited under Rule 404(b). *See e.g. United States v. Bradley,* 5 F.3d 1317, 1320 (9th Cir. 1993) (noting that guilt or innocence must be "established by evidence relevant to the particular offense being tried, not by showing that the defendant has engaged in other acts of wrongdoing").

Under the third prong, sufficient evidence must be presented so that the jury could "reasonably conclude that the [other] act occurred and that the defendant was the actor." *United States v. Hinton*, 31 F.3d 817, 823 (9th Cir.1994) (internal quotation and citation omitted), 485 U.S. 681, 689 (1988)), *cert*. denied, 115 S.Ct. 773 (1995). If the present offense is no longer connected to the "bricks/blocks" discussed in the jailhouse telephone calls, it is doubtful that the evidence would survive the third prong either.

The fourth prong, similarity, is not always required for admission of evidence under Rule 404(b). The degree of similarity between the other act and the charged act depends upon the evidentiary hypothesis asserted by the government. *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1326 (9th Cir. 1992). When attempting to establish relevance, the government "must articulate precisely the evidential hypothesis by which a fact consequence may be inferred from the other acts evidence." *United States v. Mayans*, 17 F.3d 1174, 1181 (9th Cir. 1994) (internal quotation and citation omitted). An intent theory requires strict similarity between the acts. *Ramirez-Jiminez*, 967 F.2d at 1326. But when the Government's theory of admission is based on knowledge, as it was here, then the other act need not be similar, provided that there is "a logical connection between the knowledge gained as a result of the commission of the prior act and the knowledge at issue in the charged act." *Id.*

The Government maintained that Defendant's discussions with Ms. Garibay and Cholo concerning the "bricks/blocks" suggested that Defendant had the knowledge and intent to engage in drug smuggling for the present offense. The Government would likely argue that it is irrelevant whether the "bricks/blocks" are methamphetamine as they contended, or some other drug instead, such as marijuana. *See e.g., United States v. Martinez*, 182 F.3d 1107, 1110 (9th Cir. 1999) (allowing evidence of similar acts where "the prior offenses were for different drugs, cocaine and heroin," but "the fact that distribution quantities were involved made the crimes similar enough to

bear on ... knowledge"). The mere fact that the drug transaction referenced in the jailhouse telephone calls is distinct from the present offense would not in itself render the telephone calls inadmissible. *See United States v. Bibo-Rodriguez*, 922 F.2d 1398, 1402 (9th Cir.), *cert.* denied, 501 U.S. 1234 (1991) (admitting subsequent act of transporting marijuana hidden in a car's door panels as evidence of knowledge for charged crime of transporting cocaine in car roof). However, since the Court was not given the opportunity to re-analyze its 404(b) ruling with Ms. Garibay's statements, it is impossible to determine whether the Court would have concluded that the "bricks/blocks" evidence was indeed sufficiently similar to the charged offense as required by the final prong.

Further, even though evidence is admissible under 404(b), it may nonetheless be excluded under Rule 403's balancing test, which weighs the "probative value" of the evidence against the "danger of unfair prejudice." Assuming that the "bricks/blocks" evidence re-passed the Court's scrutiny under Rule 404(b), a balancing of the equities would also need to take place, and it is doubtful that the "bricks/blocks" evidence (if deemed marijuana) would prove more probative than prejudicial.

The Court notes that "other acts" evidence does not have to meet Rule 404(b) requirements if the evidence is "inextricably intertwined" with the crime with which the defendant is charged. *See e.g., United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1012 (9th Cir.1995); *United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir.1993). Generally, to qualify as "inextricably intertwined," the evidence must be evidence that "constitutes a part of the transaction that serves as the basis for the criminal charge." *Vizcarra-Martinez*, 66 F.3d at 1012-13. However, the Government's instant dismissal of Ms. Garibay's statements regarding the "bricks" and "blocks" as marijuana and not methamphetamine, deprived this Court of determining if there was an actual significant connection of the facts to the present offense.

Since the Court was not given the opportunity to hold an evidentiary hearing regarding the new information, continued admission of the "bricks/blocks" evidence (including any references during closing argument) under either the "inextricably intertwined" theory or Rule 404(b) was improper. Considering the foregoing errors, the Court finds that the interest of justice requires that Defendant be afforded a new trial.

. . .

### III.   CONCLUSION

While it obviously cannot be determined with precision the affect the 404(b) evidence had upon the verdict in this case, the Court believes that the Rule 404(b) evidence was likely a material factor in the conviction of Defendant.  Because the case revolved upon the jury's determination of Defendant's knowledge of the drugs within the vehicle she was driving upon her arrest, the Court is not confident that the extrinsic act evidence did not affect the outcome of the trial.

Based on the information the Court learned subsequent to defense counsel's objection during the Government's closing argument, the Court is now aware of the need to reevaluate the prior Rule 404(b) ruling.  In forming this determination, under an abuse of discretion standard, the Court **GRANTS** Defendant's Motion for a New Trial for the reasons set forth above and in the interest of justice.

**IT IS SO ORDERED.**

DATED: April 3, 2009

M. James Lorenz
United States District Court Judge